## Jess Goodwin v. The State.

### No. 462. Decided March 16, 1910.

**1.—Murder—Evidence—Moral Turpitude.**

Upon trial for murder it was reversible error to permit the State, on cross-examination of defendant's witness, to show that the witness had been indicted for gambling and that an indictment was then pending against him; to impeach the credibility of the witness. Following Merriwether v. State, 55 Texas Crim. Rep., 438.

**2.—Same—Charge of Court—Principals—Keeping Watch—Encouraging by Words and Gestures.**

Where, upon trial for murder, there was evidence that the defendant first obtained a pistol which he afterwards handed to his codefendant; that he tried to procure cartridges; that he kept close behind his codefendant who shot the deceased, etc., there was no error in the court's charge on the law of principals, that if defendant kept watch or encouraged his codefendant during the homicide by words and gestures that he was a principal therein.

**3.—Same—Charge of Court—Principals—Converse Proposition.**

Where, upon trial for murder, the evidence was conflicting as to whether, at the time of the homicide, the defendant acted together with his codefendant in killing the deceased, or that the defendant at the time that deceased was shot had any intent to kill him, or to have him killed by his codefendant, the court, in submitting the law of principals, should have also submitted the converse of the proposition and presented the defendant's defensive matters as developed by the evidence. Following Smith v. State, 52 Texas Crim. Rep., 27, and other cases.

**4.—Same—Charge of Court—Murder in Second Degree—Self-Defense.**

Where, upon trial for murder, the court's charge on murder in the second degree required the jury to find, before the killing could be murder in the second degree, that it was unlawfully done and the result of a common purpose and design to kill deliberately formed, etc., the same was probably sufficient without instructing the jury that the killing must not be done in self-defense.

**5.—Same—Charge of Court—Manslaughter.**

Where, upon trial for murder, the evidence did not raise the issue of manslaughter there was no error in the court's failure to charge thereon.

**6.—Same—Charge of Court—Self-Defense—Practice on Appeal.**

Where, upon appeal from a conviction of murder in the second degree, the record did not show that complaint was made in the court below of the charge of the court on self-defense, the same could not be considered. Besides, the charge was not subject to the attacks made upon it.

Appeal from the District Court of Limestone. Tried below before the Hon. H. B. Daviss.

Appeal from a conviction of murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

*Doyle, Jackson & Harper,* and *James Kimbell* and *Callicutt & Call,* for appellant.—On question of admitting evidence of gambling of defendant's witness: Justiss v. State, 57 Texas Crim. Rep., 218, 123 S. W. Rep., 413; Merriwether v. State, 55 Texas Crim. Rep., 438, 116 S. W. Rep., 1148; Marks v. State, 78 S. W. Rep., 512; Stewart v. State, 38 S. W. Rep., 1144; Goode v. State, 32 Texas Crim. Rep., 505; Brittain v. State, 36 Texas Crim. Rep., 406, 37 S. W. Rep., 758; Houx v. State, 19 S. W. Rep., 35; Ellis v. State, 56 Texas Crim. Rep., 14, 117 S. W. Rep., 978; Jennings v. State, 55 Texas Crim. Rep., 147, 115 S. W. Rep., 587.

On question of the court's charge on principals and refusal to submit defendant's requested charges thereon: Tittle v. State, 35 Texas Crim. Rep., 96; Caruth v. State, 28 S. W. Rep., 532; Leslie v. State, 42 Texas Crim. Rep., 65; Red v. State, 39 Texas Crim. Rep., 667; Abbatta v. State, 51 Texas Crim. Rep., 510, 102 S. W. Rep., 1162; Bibby v. State, 65 S. W. Rep., 193; Scott v. State, 81 S. W. Rep., 47; Bowen v. State, 47 Texas Crim. Rep., 137, 82 S. W. Rep., 520; Ripley v. State, 51 Texas Crim. Rep., 126, 100 S. W. Rep., 943; Blain v. State, 30 Texas Crim. App., 702; Stewart v. State, 15 Texas Crim. App., 598; Levine v. State, 22 Texas Crim. App., 683; Monroe v. State, 47 Texas Crim. Rep., 59, 81 S. W. Rep., 726; Phipps v. State, 34 Texas Crim. Rep., 608; Rhodes v. State, 39 Texas Crim. Rep., 332.

On court's charge on murder in second degree: Connell v. State, 46 Texas Crim. Rep., 259, 81 S. W. Rep., 746; Thomas v. State, 45 Texas Crim. Rep., 111, 74 S. W. Rep., 36; Wheeler v. State, 56 Texas Crim. Rep., 547, 121 S. W. Rep., 166; Barr v. State, 56 Texas Crim. Rep., 372, 120 S. W. Rep., 422; McDowell v. State, 55 Texas Crim. Rep., 596, 117 S. W. Rep., 831; Davis v. State, 124 S. W. Rep., 104; Puryear v. State, 118 S. W. Rep., 1042; Burnett v. State, 46 Texas Crim. Rep., 116; Gallagher v. State, 55 Texas Crim Rep., 50, 115 S. W. Rep., 46.

On the court's failure to charge on manslaughter: Hobbs v. State, 16 Texas Crim. App., 517; Wadlington v. State, 19 Texas Crim. App., 266; Smith v. State, 52 Texas Crim. Rep., 27, 105 S. W. Rep., 183; Ripley v. State, 51 Texas Crim. Rep., 126, 100 S. W. Rep., 943.

On court's charge on self-defense: Benson v. State, 51 Texas Crim. Rep., 367, 103 S. W. Rep., 911; Phipps v. State, 34 Texas Crim. Rep., 560 and 608.

*John A. Mobley,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—The conviction from which this appeal results

58 Texas Criminal Reports.

was secured in the District Court of Limestone County on the 17th day of July of last year. The judgment carried a conviction of murder in the second degree, in which appellant's punishment was assessed at confinement in the penitentiary for a period of twenty years.

The indictment filed June 26, 1909, contained three counts. The first count alleged that appellant with malice aforethought did unlawfully kill Woody Clancy by shooting him with a pistol. The other counts were dismissed by the district attorney, and the case submitted to the jury on the first count charging appellant with murder in the usual form. There are a great many questions raised in the record, a few of which only we will notice. For the most part the case seems to have been well tried, and except in the respects herein noted we think no error was committed for which the judgment should be reversed.

The testimony shows that appellant was a young man about 20 years of age, and that he had been married but a short time before the homicide. One A. L. Eggleston, who is shown by the evidence to have fired the shot that killed Clancy, was a much older man. Appellant had lived in the community where the killing occurred many years. Eggleston had lived there but a few months. Clancy, who was killed, was a young man, and had lived in the community for several years. There is some evidence that a few years before the killing there had been some disagreement between appellant and Clancy, but for a long time before the killing their relations seemed to have been not unfriendly. The evidence shows that there was very slight, if any, acquaintance between Eggleston and Clancy, and there is no pretense of any motive for the killing except it may be found in the conduct of the parties towards each other on the night of the fatal meeting. Jackson, who figures in the case, was an uncle of appellant, and lived between 100 and 200 yards from the residence of a negro where, on the night in question, some kind of festival was in progress. The evidence shows that appellant and Eggleston went to this negro's house where there were a number of other negroes, and that appellant, at least, was engaged part of the time in gambling with them. These parties went to the house about dark on the night of the homicide. Clancy, with a number of other white boys, came to the house somewhere around 10 o'clock at night, probably later. The evidence discloses that something was said between Eggleston and Clancy about playing cards, when Clancy said, in substance, that he could beat Eggleston playing pitch, and he would bet anything from one dollar to one hundred dollars on that kind of a game. Thereupon Eggleston went off to get some cards, and soon returned with the statement that he could not find any, when deceased remarked it was all right, he did not want to play anyway, that he was just "stalling." Something was said about this time about the presence of the other white men there other than appellant and Eggleston, and some suggestion was made that they might give information as to the gambling going on,

when appellant, among other things, said that deceased was a tattler. Some short time before the killing, and while most, if not all of the white men, whose names appear in the record, were in the house, some four or five shots on the outside were heard. Soon after this appellant obtained a pistol from Eggleston and went outdoors, as he says, to make some investigation as to the firing, and that he carried the pistol with a view of protecting himself if assaulted. While outdoors appellant sought to buy some more cartridges for the pistol, and manifested some anxiety so to do. He did not, however, obtain any cartridges. Soon after this Eggleston appeared on the scene of action and said to appellant that he was going to run those yaps or pimps away from the house. That in this connection appellant called to him, "Come here and get this," when Eggleston came and got the pistol, and that thereupon some inquiry was made as to what pimps he referred to, when appellant replied: "That damn Clancy boy." That in the conversation Joe Holley, a negro, spoke up and said, "I think Mr. Woody (meaning deceased) is all right;" that he was in the house, and had told Jake that the boys ought not to gamble while the white boys were there; that they might get some of them sent over to Coolidge, when appellant spoke up and said, "No; he is the very God-dam rascal." That on obtaining the pistol from appellant Eggleston left, going around the house. It is shown by the testimony of Ivey Blunt, a young white man, that very soon after Eggleston had left that appellant said to him, "I had better go and stop that fellow; he is just about drunk enough to hurt somebody," and started going in the direction Eggleston had taken. Appellant locates himself, and other witnesses place him, a few feet from and behind Eggleston. There is some slight testimony of an angry conversation between deceased and Eggleston. The issue of self-defense is raised mainly by the res gestae statements of Eggleston. Appellant, who was present, by his testimony scarcely raises this defense. It is not claimed in the evidence that appellant fired the shot or that he did anything at the very time of the shooting. Appellant expressly denies any conspiracy to kill deceased or any knowledge that Eggleston intended to kill him. There is some evidence in the record from which we think the jury were authorized to draw the conclusion that Eggleston's act in killing Clancy was done and his purpose formed so to do on account of the matters involved in the angry conversation testified to by the witnesses. Immediately after the fatal shot was fired the evidence shows that appellant went in great haste to where his uncle, Mr. Jackson, lived, and soon thereafter returned, made some examination of deceased, and again left the house where the killing was done, going in the direction of Jackson's place, and almost immediately returned with him. That Jackson and appellant were the first white people to reach the body of deceased, and the first persons to make any examination of him at all. Deceased's body lay within but a few feet of the house in which was at least one window in a room where a number

of negroes were at the time. Immediately on getting to deceased Jackson and appellant both insisted upon the negroes getting in the house, letting down the windows and closing the blinds. Very soon after this some of the other witnesses arrived. Jackson had a lantern, and in examining the body of deceased and the location of objects immediately surrounding him, Jackson claimed to have found a knife, and made the statement: "Here is a knife," when appellant replied, "Yes, here is a knife." The examination of these witnesses, who were white men, plainly conveys the idea, and there seems to be at least some fair basis of truth in the suggestion that the knife had evidently been placed there by Jackson or appellant, or both, and that their object in making the negroes go in the house and remain there and let down the windows was to enable them thus secretly to place a knife near the body of deceased, and in such position as to imply that it was his knife, and to thus aid in manufacturing a defense. Mr. Jackson was produced as a witness for appellant, who frankly admitted his interest in the case. He stated he was not present at the shooting, but appellant and Eggleston came immediately to his house and woke him up, when Eggleston made a statement which, as we say, raised the issue of self-defense, and that he went at once to the house where the deceased's body lay, and remained there for the most part of the night. He denies having placed the knife there, and insists the knife was there when he arrived and made his examination. Jackson's testimony is of the highest importance to appellant for two reasons. In the first place, the issue of self-defense raised in the evidence rests largely on his testimony. It is to him that the res gestae statements involving the issue of self-defense were made, and his testimony was also important as to finding the knife near the body of deceased.

1. In this condition of the record the State, over objections by appellant, was permitted to show by Jackson, on cross-examination, that he had been indicted and there was then pending an indictment against him for gambling. This was admitted by the court and limited for the purposes of impeachment. This testimony was not admissible. In the case of Merriwether v. State, 55 Texas Crim. Rep., 438, 116 S. W. Rep., 1148, we undertook at some length to consider this question, and to review and reconcile the authorities in this State which had theretofore been in much confusion. A summary of the rule there stated is as follows: "We understand the rule to be that charges preferred in a legal manner, and certainly convictions of crime which imply moral turpitude, are receivable in evidence as affecting the credibility of a witness or a defendant; but this rule has not been applied, we think, and should not be applied in respect to convictions which do not involve moral turpitude or of the grade of felony or such as are not of a class that the law recognizes as involving moral turpitude." See also Justiss v. State, 57 Texas Crim. Rep., 218, 123 S. W. Rep., 413. The relation of Jackson to the case, his candid and open confession of his interest in and partiality towards defendant,

and indeed all the circumstances, not only made his testimony of the highest importance to appellant, but the admission of any testimony on which the jury could predicate a finding or belief adversely to him made it peculiarly important that no testimony not legally receivable should have been admitted to destroy whatever weight that otherwise the jury would have given his evidence.

2. The next matter, and perhaps a matter of the most importance, relates to the charge of the court on the doctrine of principals, appellant's objections thereto, and the failure of the court to give the 4th and 6th special charges requested by appellant. The 9th paragraph of the charge of the court is as follows: "The law provides that all persons are principals who are guilty of acting together in the commission of an offense. When an offense is actually committed by one person, but another is present and knowing the unlawful intent, aids by acts, or encourages by words or gestures, the person actually engaged in the commission of the act; or where such other person, though not being actually present, keeps watch so as to prevent the interruption of the person engaged in committing the offense: In either such case such other person so aiding, encouraging or keeping watch, is a principal offender with the person committing the unlawful act, and may be convicted and punished as such person committing the offense. If one person shall engage in procuring aid or arms to assist in the commission of an offense while another actually executes the unlawful act, such person is a principal and may be convicted and punished as such. And any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the commission of the offense.

"To constitute the defendant Jess Goodwin a principal with Eggleston in the commission of the offense, if any, you must believe from the evidence beyond a reasonable doubt that Jess Goodwin did act with Eggleston in forming the design to kill Woody Clancy, and did act with him, or aided him in some way, or encouraged him in the commission of the act; or, that, though not being actually present with Eggleston when the offense was committed, Jess Goodwin did watch so as to prevent the interruption of said Eggleston; or that Jess Goodwin did procure and furnish aid or arms to Eggleston with which to commit the offense; or that Jess Goodwin did advise and agree with Eggleston to the commission of the offense, and was present when the offense was committed, whether Goodwin aided or not in the commission of the offense, in either such event Jess Goodwin would be a principal offender with Eggleston, provided Eggleston was guilty of an offense."

The 4th and 6th instructions requested by counsel for appellant are as follows:

"At the request of the defendant you are charged that even if you find from the evidence beyond a reasonable doubt that the defendant

and A. L. Eggleston entered into an agreement by which Eggleston should attempt to make the deceased, Woody Clancy, leave the house where the negro festival was being held, in order to prevent said deceased from seeing parties gamble at said festival, and that said Eggleston went further than was agreed upon between the defendant and said Eggleston and became involved in an altercation with deceased which resulted in said Eggleston shooting and killing the deceased, and not in pursuance of said original agreement between said defendant and Eggleston and shot and killed deceased, then under such state of facts defendant would not be guilty of the offense of murder as charged in the indictment, and your verdict should be not guilty. In other words, you must find beyond a reasonable doubt in the issue of conspiracy that it was mutually agreed between said Eggleston and the defendant that said Eggleston should kill and murder the deceased, and this agreement must be shown by the evidence to exist, otherwise upon this phase of the case the defendant is entitled to be acquitted, you will not consider the other issues any further. Now, if you fail to find such specific agreement as herein defined to exist by the evidence and beyond a reasonable doubt, you will acquit the defendant and say by your verdict not guilty.

"At the request of the defendant you are instructed that if you believe from the evidence beyond a reasonable doubt that A. L. Eggleston in the presence and hearing of the defendant Jess Goodwin said that he was going around there and run them damn yaps off (meaning Woody Clancy), and that defendant Jess Goodwin by his acts and words encouraged said A. L. Eggleston to commit such offense, but have a reasonable doubt as to whether or not said A. L. Eggleston at said time had conceived the idea of killing said Woody Clancy, and after the said A. L. Eggleston had started around the house he met Woody Clancy and a wordy altercation ensued between the said Eggleston and Clancy and that then and there the idea was formed and conceived in the mind of the said A. L. Eggleston to kill the deceased, the defendant Jess Goodwin would not be guilty of the offense charged, and if you so believe you will acquit the defendant and return a verdict of not guilty."

The 9th paragraph of the charge of the court above quoted is vigorously assailed on the ground that there was no evidence which raised the issue of appellant keeping watch so as to prevent an interruption of Eggleston; and further that the testimony did not raise the issue that he aided him by acts or encouraged him by words or gestures. It is seriously contended that there is no evidence in the record that the parties acted together in the commission of the offense. Without going into details, we think that the evidence justified the court in submitting all these matters to the jury. The fact that appellant first obtained the pistol, his leaving the room, and his effort to secure other cartridges, the almost immediate appearance of Eggleston, the call of appellant to Eggleston to come and get the pistol, Eggleston's de-

parture while appellant was yet talking to his companion, the secrecy and mystery of their movements, all to our minds raised the issue of an acting together, and it is not certain but that the jury would have been justified in concluding that the fact that appellant remained behind talking to Blunt, and the fact that he maintained his position where he was, was in aid of the purpose of Eggleston, and the fact that he furnished him, Eggleston, with a weapon, and his statement with reference to deceased, all raised the issue to be considered by the jury of keeping watch and of encouragement both by words and gestures. We think, however, there is merit in appellant's contention that the court erred in not charging the converse of the propositions contained in section 9 of the charge. The charge of the court touching these matters does not present the defensive matters developed by the evidence of appellant. Appellant's evidence raised the issue that he did not agree with Eggleston to kill deceased or to do him any harm whatever, and had nothing to do with the killing at all; that he had no design or intention to kill deceased, and knew of no such design. His testimony also raises the issue and in this he is supported by the testimony of Blunt, that even if it be conceded that he was advised of Eggleston's purpose to make some of the persons present there leave the place, that he did not consent to murder as a means of accomplishing this end, and there is evidence, as we have said, which to our minds raised the issue that the killing developed from and grew out of the matters happening between deceased and Eggleston after Eggleston had left the presence of appellant. If it should be urged that this testimony is either not cogent or probably untrue, the answer is that these were matters for the jury. Therefore, we think that clearly the first clause of paragraph 4 of the special charge and all of special charge No. 6, above quoted, should have been given in charge to the jury. Smith v. State, 52 Texas Crim. Rep., 27, 105 S. W. Rep., 183; Ripley v. State, 51 Texas Crim. Rep., 126, 100 S. W. Rep., 943; Bibby v. State, 65 S. W. Rep., 193; McDonald v. State, 46 Texas Crim. Rep., 4, 79 S. W. Rep., 542.

3. Complaint is made of the charge of the court on murder in the second degree. The particular paragraph complained of is as follows: "Now if you believe from the evidence, beyond a reasonable doubt, that A. L. Eggleston, in Limestone County, State of Texas, on or about June 13, 1909, with a pistol, same being a deadly weapon, did unlawfully shoot and thereby kill Woody Clancy; and you further believe from the evidence beyond a reasonable doubt that such killing was the result of and in furtherance of a common purpose and design to kill Woody Clancy, deliberately formed and entered into between Eggleston and the defendant Jess Goodwin; and you further believe that Jess Goodwin is a principal offender with Eggleston in the commission of the offense, as hereinbefore defined in paragraph 9 of this charge, then you will find Jess Goodwin guilty of murder in the second degree, and you will assess his punishment at confinement in

the State penitentiary for any period of time, provided it be for not less than five years." And the contention is that the jury were not required by the terms of this charge to believe that the act of killing was not in self-defense. We think, considered altogether, that perhaps this charge might be sustained in view of the fact that the jury were required to find, before the killing could be murder in the second degree that it was unlawfully done, and the result of and in further-ance of a common purpose and design to kill Wood Clancy deliberately formed and entered into by the parties. However, we think on an-other trial it would be better to include in the charge the considera-tion of the matter of self-defense. In the recent case of Best v. State, we have undertaken to lay down an approved charge on murder in the second degree, which, excluding the matter of manslaughter re-ferred to in said charge, might furnish some aid in this case.

4. Again, it is urged that the court erred in not charging on man-slaughter. Without going into a statement of the evidence, which would require more time than we can devote to it, it is our opinion that manslaughter is not in the case, and the court did not err in not submitting this issue to the jury.

5. Again, complaint is made of the charge of the court on the issue of self-defense. This matter is largely covered by the 17th para-graph of the court's charge, which is as follows: "Every person is permitted by law to defend himself against any unlawful attack, rea-sonably threatening injury to his person, and is justified in using all necessary and reasonable force to defend himself, but no more than the circumstances reasonably indicate to be necessary. Homicide is justified by law when committed in defense of one's person against any unlawful and violent attack, made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily in-jury. A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant. If from the evidence you believe that defendant A. L. Eggleston killed Woody Clancy, but further believe at the time of so doing Woody Clancy had made an attack on him which, from the manner and char-acter of it, and considering the relative strength of the parties and the instrument used caused Eggleston to have a reasonable expecta-tion or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear the defendant Eggleston killed Woody Clancy, then you should acquit the defendant Jess Goodwin."

We might content ourselves, in passing on this matter, with the statement that no complaint was made in the court below of this paragraph of the charge of the court. However, if the matter had

been presented, we do not think that the charge is subject to the attacks made on it. The only evidence raising the issue of self-defense at all was based on the hearsay statement of Eggleston that when he shot deceased, deceased *was cutting at him.* It is not a case raising the evidence of preparation for an attack or that he was about to make an attack upon him. We think the court might well omit the clause, "considering the relative strength of the parties," unless there was other evidence in the case than appears in the record here, and even if the facts were different, in view of the character of the knife, the phrase complained of could only be misleading.

6. There are many other matters discussed in the brief which we have not felt called on to discuss. Some of them are matters not likely to occur on another trial, and in respect to the others we feel there is no error in the action of the trial court.

For the error indicated, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*