## WALTER BUCKLEY v. THE STATE.

### No. 3764.  Decided December 22, 1915.

### Rehearing denied January 1, 1916.

**1.—Murder—Identification of Defendant—Charge of Court.**

Where, upon trial for murder, it was contended upon appeal that no witness outside the accomplice placed defendant at the scene of the homicide, but the record showed that the defendant was present, not only at the time deceased was killed, but at each and every place where he and his co-defendants stopped and fired into houses and whipped and abused other negroes and that they were all acting together, there was no error. Neither was it necessary for the court to define the word "corroborate," which has a definite and well understood meaning.

**2.—Same—Evidence—Other Transactions—Conspiracy.**

Where, upon trial of murder, the testimony as a whole showed a conspiracy, each step in the conspiracy was properly admitted in evidence, and the acts and conduct of each conspirator in the execution of the common design was admissible in evidence against each of the conspirators, and there was no error in admitting testimony that on the night of the homicide defendant and his co-defendant shot into other houses and abused other negroes before they went to the house of the deceased for the same purpose.

**3.—Same—Independent Motive—Charge of Court—Burden of Proof.**

Where, upon trial of murder, the defendant was charged with others in entering into an agreement to whip and abuse negroes on the night of the homicide, and the evidence showed that they proceeded to do so and armed themselves with a rifle and shotgun, and that about midnight some of defendant's co-defendants forcibly entered the house of deceased and killed her, and defendant claimed that their purpose was to whip and abuse the husband of the deceased, and that if deceased was killed it was on the independent motive of one of the co-defendants, but the court in his charge on principals directly applied the law to the facts and charged the jury that unless they believed from the evidence, beyond a reasonable doubt, that defendant acted as principal to acquit him, there was no reversible error. Davidson, Judge, dissenting.

**4.—Same—Rule Stated—Conspiracy.**

Each conspirator is responsible for everything done by his confederates which follows immediately in the execution of the common design as one of its natural and probable consequences, even though it was not intended as a part of the original design. Following Mitchell v. State, 36 Texas Crim. Rep., 278, and other cases.

**5.—Same—Rule Stated—Conspiracy.**

If several conspire to invade a man's household and go to it armed with deadly weapons, to attack and beat him, whereupon one gets into a difficulty

with him and kills him, the rest are guilty also of murder, although they did not mean it.

**6.—Same—Mistake—Accident—Charge of Court.**

Where, upon trial of murder, the evidence raised the issue that defendant's co-defendant shot deceased by mistake and accident in an attempt to shoot the husband of the deceased, and the court instructed the jury that if they so found from the evidence to convict the defendant of murder, there was no reversible error. Davidson, Judge, dissenting. .

**7.—Same—Implied Malice—Killing Third Party—Rule Stated.**

The question of when one person shoots at another, and kills a third person, has been frequently before this court, and it has always been held that the accidental killing of a third party in an attempt to slay another is murder upon implied malice. Following Breedlove v. State, 26 Texas Crim. App., 445, and other cases.

**8.—Same—Ratification—Charge of Court.**

The question of ratification after the offense was committed was not submitted by the court in his charge, and there is no evidence raising such issue. Davidson, Judge, dissenting.

**9.—Same—Case Stated—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence tended to show that defendant and three others conspired to go to the negro quarters and whip negroes; that it might become necessary to kill some of them, for which purpose they armed themselves with deadly weapons, and that in furtherance and in pursuance of the common design the deceased was killed, and that the homicide grew directly out of the conspiracy entered into by all four of the parties, a conviction of defendant for murder is sustained. Following Davis v. State, 78 Texas Crim. Rep., 352. Davidson, Judge, dissenting.

Appeal from the District Court of Jasper. Tried below before the Hon. A. E. Davis.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*J. T. Adams* and *Forse & Hamilton,* for appellant.—On question of independent impulse: Smith v. State, 52 Texas Crim. Rep., 27, 105 S. W. Rep., 182; Harris v. State, 15 Texas Crim. App., 629; Turner v. State, 20 id., 56; Blain v. State, 18 S. W. Rep., 862; Renner v. State, 65 S. W. Rep., 1102.

On question of other transactions: Barkman v. State, 52 S. W. Rep., 69; Hunt v. State, 60 S. W. Rep., 965; Smith v. State, supra.

On question of insufficient corroboration of accomplice: Jones v. State, 59 Texas Crim. Rep., 559, 129 S. W. Rep., 1120.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of conspiracy: Blaine v. State, 33 Texas Crim. Rep., 236; Baker v. State, 45 id., 392; Smith v. State, 48 id., 233; Serrato v. State, 74 Texas Crim. Rep., 413, 171 S. W. Rep., 1133.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the

second degree, his punishment being assessed at ten years confinement in the penitentiary.

The case originated in Newton County and was transferred on change of venue to Jasper County, where it was tried. It may be stated this is a companion case to Harvey Davis v. State, reported in 76 Texas Crim. Rep., 117, 172 S. W. Rep., 978. The two convictions grew out of the same transaction. It is deemed unnecessary to go into a detailed statement of the voluminous testimony. It is sufficient to state, it substantially shows that Dock Hughes, Tom Hughes, Jr., Harvey Davis and appellant got together with the understanding that they were going to whip a negro, and it may also be inferred that they may have gone far enough in their agreement to include more than one negro. In pursuance of this understanding, they went together, Harvey Davis being on horseback and the other three in a buggy; at least the four left in company and went to two or three different places and whipped two or three negroes. About midnight they concluded, at the instigation of Dock Hughes, to go to the residence of Joe Kellum and give him a whipping. The reason for this is stated to be that it would make him raise a better crop than if he did not have the whipping. They reached Kellum's house somewhere between 12 and 1 o'clock at night. Dock Hughes sought entrance at the door, but did not obtain it. Tom Hughes, Jr., a relative of Dock Hughes, and Dock Hughes finally entered the house by breaking open the door. Kellum declined to let them enter the house. He was sleeping on one bed and his wife on another in the same room. The contention of the State is, that appellant went around to another door to prevent Kellum escaping from that direction, but it seems he did not remain there but came away. At any rate, Dock Hughes and Tom Hughes entered the room. Grace Kellum, the deceased, expostulated with them for coming in her room, that she was dressed only in her night clothing, and asked them to leave. Grace Kellum had gone from her bed over to her husband's bed and was sitting on it. Her husband, in the meantime, had obtained his gun, and secreted himself at the foot of the bed out of sight. Tom Hughes lighted a match. This went out and he called for more matches, but deceased informed him they had none. He found a lamp and undertook to light it, but it contained no oil. About that time the shooting began. Joe Kellum, a State's witness, testified that Dock Hughes fired first. Tom Hughes, who turned State's evidence, testified that Joe Kellum fired first. Joe Kellum's shot took effect in Dock Hughes' body, from which he died. Dock Hughes shot Grace Kellum twice in the right breast. When Tom Hughes discovered that Dock Hughes had been shot, he picked up Dock's gun and walked to where the woman was for the purpose of shooting her again. He found her in a dying condition, making a noise indicating what we would call the "death rattle." When he did this appellant took the gun from him and prevented further shooting. She died shortly afterwards. The survivors were indicted for killing Grace Kellum.

The theory of the State was that this was a conspiracy between the

parties to whip negroes, and among them Joe Kellum, and that being true, that all the acts and subsequent events brought about by the four implicated made each responsible for everything that occurred, even to the killing of Grace Kellum. The appellant combated this theory from every standpoint that would suggest itself to counsel. They contend, first, that when Dock and Tom Hughes went into the house, that he, appellant, would be bound no further than the agreement between them, if such an agreement was made as contended by the State, to get Joe Kellum out and give him a whipping. That this did not contemplate a killing of Joe Kellum. The writer is disposed to agree with that theory of the case, but he may be in error about that under the recent case of Serrato v. State, an opinion by Judge Harper, coincided in by Judge Prendergast. In that case I entered my dissent. But be that as it may, perhaps the court would have been justified in submitting the case upon the theory that as they went there for the purpose of whipping Joe Kellum, had they killed Joe Kellum appellant might have been responsible, he being there about the house at the time of such trouble. But Joe Kellum was not killed; he was not even shot at. Tom Hughes, the State's witness, who turned State's evidence, testified that the woman was shot by Dock Hughes on purpose. He shot her twice while she was sitting on the bed, and as I understand the record Joe Kellum was not shot at and was not even seen by the parties after they entered the house. That he fired from behind the foot of the bed and killed Dock Hughes, and Dock Hughes then killed Joe Kellum's wife. There is some evidence that Grace threatened the life of Dock and Tom Hughes after they entered the room. There is no evidence in this record, nor intimation from any source—State or defendant— that Grace Kellum was included in any of their agreements, or that she was even thought of when they went to Joe Kellum's house. They went there to whip Joe Kellum. They did not seem to have known Grace Kellum was at home. If appellant and Harvey Davis and the two Hughes agreed to whip Joe Kellum, under the Serrato case they possibly might be guilty of anything that followed, so far as Joe Kellum was concerned. But this rule certainly ought not to apply to Grace Kellum and her tragic ending, so far as appellant is concerned. He knew nothing of it until after the killing. It was not within the contemplation of any of the parties at the time they went to the house of Joe Kellum.

The court charged the jury on the law of principals in a general way, and then gave this charge: "If you believe from the evidence beyond a reasonable doubt that the defendant, Walter Buckley, was present at the time Grace Kellum was killed, if she was killed, and if you believe from the evidence beyond a reasonable doubt that Dock Hughes, Harvey Davis and Tom Hughes, Jr., or either of them, killed Grace Kellum, if she was killed, yet, if you find from the evidence, that the defendant, Walter Buckley, did not aid, or encourage the said Dock Hughes, Harvey Davis, or Tom Hughes, Jr., or either of them, to kill Joe Kellum or Grace Kellum, by any word or act or gesture, and did

not know the unlawful intention, if any, of the said Dock Hughes,
Harvey Davis and Tom Hughes, Jr., or either of them, to kill Grace
Kellum or Joe Kellum, or to commit some unlawful act which might
lead in its natural or probable consequences to the killing of Joe Kellum
or Grace Kellum, or if you have a reasonable doubt about this, then
you will find the defendant, Walter Buckley, not guilty." Exception
was reserved to this charge both before it was read to the jury and
afterwards in motion for new trial, and reserved in a bill of exceptions
independent of the original exceptions, among other things, that it
placed the burden of proof on defendant, changed the reasonable doubt,
and charged affirmatively that the jury must believe he did not aid or
encourage the others in killing either Joe Kellum or Grace Kellum,
before they could acquit him of killing Grace Kellum.

Again, the court charged the jury: "If you believe from the evi-
dence beyond a reasonable doubt that Walter Buckley, either alone or
acting as a principal with Dock Hughes, Harvey Davis and Tom Hughes,
Jr., or either of them, as that term has heretofore been defined to you,
in the County of Newton, and State of Texas, on or about the 10th
day of August, A. D. 1914, with a deadly weapon, did shoot and thereby
kill Grace Kellum by mistake or accident, and at the time of the killing
it was his intention, either alone or acting as principal with Dock
Hughes, Harvey Davis and Tom Hughes, Jr., or either of them, to kill
Joe Kellum, and you further believe beyond a reasonable doubt that
said killing was committed with malice aforethought, then you will
find the defendant, Walter Buckley, guilty of murder." Exception was
reserved also to this charge and counter charges asked. These matters
are properly presented without going into a detailed statement. We are
of opinion that these charges were not correct. The burden of proof
is on the State and not the defendant. The defendant does not have
to prove that he did not aid or encourage the killing. The State must
prove that he did, and again the court coupled the killing of Joe
Kellum, which may have possibly been within the terms of their agree-
ment to whip him if he resisted, with the killing of Grace Kellum; it
coupled Joe Kellum with Grace Kellum, and the jury is charged that
if these parties killed either they must find that appellant did not aid
and encourage before they could acquit. The second charge wherein
the court charged the jury with reference to a mistake or accident on
the part of Dock Hughes and others in killing Grace Kellum, was not
raised by the facts. Tom Hughes, Jr., who turned State's evidence,
makes it apparent that Dock Hughes killed the woman, deliberately
and intentionally firing two shots while she was sitting on the bed.
There is no evidence from this witness, as I understand this record,
that Dock Hughes shot at Joe Kellum. In fact, he seems not to have
shot at him; he was hid behind the bed, Dock shot and killed the woman.
There was no mistake or accident in this matter. The theory of mis-
take or accident is based upon the theory that he was shooting at Joe
Kellum and by mistake or accident killed Grace Kellum. There is no
evidence to sustain that proposition. The State's evidence excludes it.

If Joe Kellum had been killed appellant might be guilty of the homicide. But he certainly ought not to be held responsible for the act of Dock Hughes killing the woman sitting on the bed, either by mistake, accident or purposely, under the facts of this case, and the jury should have been so instructed. In other words, before appellant could be convicted in this case for the death of Grace Kellum, it ought to have been shown that she came within the terms of the agreement made between them. If after Dock Hughes got in the house he changed his mind about the matter, or concluded to kill this woman, appellant ought not to have been charged with that unless he in some way knew and acquiesced in it before the killing. The State's evidence excludes that. The subsequent ratification would not have made him responsible. The doctrine of ratification of crime does not obtain. That was expressly decided in Walker v. State, 29 Texas Crim. App., 621. In other words, to restate this case, as the law it seems ought to be enunciated, if when these parties started out that night to whip one or more negroes, and finally by distinct agreement among themselves said they would whip Joe Kellum and thus cause him to make a better crop, and they went to his house for that purpose, all being there at the house, in or about it, and around the yard, and Joe Kellum was killed under those circumstances, appellant would be brought within the terms of the homicide law, especially as announced in the Serrato case, supra, and might be punished for the act of Dock Hughes. But he would not be responsible for the independent act, and with which he was in no way connected, and not within the terms of the original agreement either directly or indirectly, in killing the woman. He ought not to be held responsible for that homicide, and the jury should have been told so plainly.

For the error in the charge of the court and failure of the court to submit the correct issues, this judgment is reversed and the cause remanded.

*Reversed and remanded.*

HARPER, JUDGE.—While not agreeing to all that is said in the opinion, I concur in the reversal of the case. Will write my views later, setting forth plainly the portion I concur in and the part I do not agree to.

### ON REHEARING.

### December 22, 1915.

HARPER, JUDGE.—On a former day of this term this case was reversed and remanded, the writer of this opinion at the time agreeing to the reversal, but stating at the time he did not agree to all that was written, and would write his views later. Since then we have had occasion to study this record carefully, as well as the companion case of Harvey Davis, recently decided, and we have become convinced that the court erred in reversing the case, and, therefore, the motion for rehearing should be granted.

In this case the evidence would show that appellant, Dock Hughes and Tom Hughes were at Preston Hughes' store in Bon Wier about 3 o'clock on Monday, August 11, 1914, in the afternoon, when Harvey Davis came along and treated them all to cider in Preston Hughes' store. That Harvey Davis then started, when Dock Hughes asked him what was his hurry, and Davis replied, "I've got to get me a negro," Dock Hughes replying, "You needn't be in such a hurry—I've got to get me one, too." That Harvey Davis and Dock Hughes then walked off to themselves and held a conversation, which was not testified to. After this conversation Davis went on off, and Dock Hughes came back in the store, and when the train came along, Dock Hughes, Tom Hughes and appellant went six miles distant, and purchased four quarts of whisky, returning to Bon Wier about 7 o'clock. These three, the two Hughes and appellant, got in a buggy, taking the whisky with them, and went to the home of Harvey Davis, who there joined the other three, and all four went down into what is called the negro settlement, first stopping near the home of June Thomas, intending to give him a whipping. They took a mosquito bar and made masks, so that the negroes would not know them. Not finding June Thomas at home, all four started toward the negro schoolhouse, where the negroes were having a school meeting. On the way to the schoolhouse two negroes were seen going towards June Thomas' house, and Tom Hughes, appellant and Harvey Davis went back to this negro's house, but again failed to find him. While they were doing this Dock Hughes went into the negro schoolhouse and fired off his gun, a negro, Word Stepney, getting hold of the gun until he could get out of the house. All the negroes were run from the schoolhouse, and when appellant, Harvey Davis and Tom Hughes returned Dock Hughes was standing by the house laughing. The party had a rifle and shotgun with them, and after they all got back both the rifle and shotgun were fired into the house, breaking out the windows. It is clear that Dock Hughes fired the rifle, but the evidence does not make it clear who fired the shotgun into the house, but places all four men there together. It appears that Dock Hughes thought he saw someone behind a tree, and called to "Walter" to go around the tree. Only one Walter is shown to be present—appellant. Finding no one behind the tree, Dock Hughes told them Word Stepney had choked him while he was in the school-house, and he was going up to his house and kill him. All four went up to Word Stepney's house, apparently for this purpose, but the negro was hid in the adjoining fields and they failed to find him. They then went to the house of A. Clark, a negro preacher, and Harvey Davis and Dock Hughes went in the house and called for some liniment, the other two remaining in the buggy. Failing to get the liniment, Harvey Davis began whipping Clark, and made him get down and pray. Dock Hughes then threw Clark out of doors. The whipping was done with a mule whip. The negroes say that after Clark was thrown out someone fired into the house. Tom Hughes testifies it was Dock Hughes who shot into the house, while the negroes would

have the shots by someone else while Harvey Davis and Dock Hughes were whipping Clark and throwing him out of the house. The negroes and Tom Hughes testify that the four men then went to the house of Mary Lewis, got Jim Parmer, and carried him off about sixty feet, and caused Jim to kneel down and pray. Another negro, Elzie McCain, came up and they made him kneel down and pray, and then whipped him and run him off. Joe Kellum, whose wife was killed that night by Dock Hughes, lived about five hundred yards from Mary Lewis' house. When they left Mary Lewis' house they went to Joe Kellum's to whip him, it being between 12 and 1 o'clock at night. The testimony of Tom Hughes shows that when they got to Kellum's, appellant, Walter Buckley, was placed at the back door to catch Joe if he undertook to escape that way. That Dock Hughes and Harvey Davis went to the front door and called Joe, Harvey Davis telling him that his horse had gotten loose and he wanted him, Joe, to help catch him. Joe told him his wife was unwell, when they told him if he did not open the door they would shoot into the house. Joe got behind the bed. The door was broken open and Dock and Tom Hughes entered the house, where the woman was killed. Tom Hughes testifies that Joe Kellum fired first, while Joe swears that Hughes fired first. The evidence will be further discussed in disposing of the questions raised.

It is contended that no witness outside of the accomplice, Tom Hughes, places appellant at the house when Grace Kellum was killed. Rev. L. C. Bowden places all four men together when they were at Preston Hughes' store. Tom Gibson places appellant, Dock and Tom Hughes together when they started to Harvey Davis' that night. Tom Hughes has appellant with them all the time, and at the place of the killing. When the men are seen that night at the various and sundry places, four white men were together, and the circumstances conclusively corroborate Tom Hughes in his testimony that appellant was present, not only at the time Grace Kellum was killed but at each and every one of the other places where they stopped, shooting into houses, whipping negroes and making them kneel and pray. Neither was it necessary for the court to define the meaning of the word "corroborate." It has a definite, well-understood meaning.

Appellant also insists that the testimony about whipping other negroes, shooting into other houses, and testimony about going up to the house of Word Stepney to kill him for choking Dock Hughes, was inadmissible, and the testimony ought to be limited down to what occurred at the house of Joe Kellum. When the testimony as a whole shows a conspiracy, each step in the conspiracy is properly admitted in testimony, and the acts and conduct of each conspirator in the execution of the common purpose and design are admissible against each of the conspirators. See Branch's Crim. Law, sec. 240, and cases cited.

Appellant insists, however, that, if the conspiracy was to whip Joe Kellum only, and Dock Hughes killed Grace Kellum upon an inde-

pendent motive of his own, he would not be guilty. To this proposition of law we readily accede, and agree that the authorities cited by Judge Davidson in the original opinion and in the opinion on the motion for rehearing correctly so hold, and that no subsequent ratification of the murder, if he was not liable at the time of its commission as a principal, would render him liable as a principal offender. To these propositions of law, announced by Judge Davidson, we entertain no different view from that expressed by him, but the reason we concurred in the original opinion reversing the case, we were then under the impression that the court in his charge had shifted the burden of proof to defendant to show that the killing was done upon an independent motive. If the charge does do so, it would be error, and we would readily concur in the reversal of the case. But this, in our opinion, is not the correct construction to be placed on the language of the charge of the court. After correctly defining who are principals, in the commission of an offense, and telling them that the "mere fact that a person is present when an offense is committed does not constitute or make him a principal" in the commission of an offense, but that he must not only be present, he must go further and aid by acts or encourage by words or gestures those actually engaged in the commission of the unlawful act in pursuance of a common design and purpose, before he would become liable as a principal offender, he instructs the jury:

"And in this case if you believe from the evidence beyond a reasonable doubt that the defendant, Walter Buckley, was present at the time Grace Kellum was killed, if she was killed, and if you believe from the evidence beyond a reasonable doubt that Dock Hughes, Harvey Davis and Tom Hughes, Jr., or either of them, killed Grace Kellum, if she was killed, yet, if you find from the evidence, that the defendant, Walter Buckley, did not aid, or encourage the said Dock Hughes, Harvey Davis or Tom Hughes, Jr., or either of them, to kill Joe Kellum or Grace Kellum, by any word or act or gesture, and did not know the unlawful intention, if any, of the said Dock Hughes, Harvey Davis and Tom Hughes, Jr., or either of them, to kill Grace Kellum or Joe Kellum, or to commit some unlawful act which might lead in its natural or probable consequences to the killing of Joe Kellum or Grace Kellum, or if you have a reasonable doubt about this, then you will find the defendant, Walter Buckley, not guilty."

In this he instructs the jury that, although they find appellant was present when Grace Kellum was killed, if the jury did not find that he aided and encouraged the person offending, by word, act or gesture, and if he did not know of the unlawful intention to commit an unlawful act which might lead in its natural and probable consequence to the killing of Grace Kellum, they would acquit appellant. We were under the impression at the time of the original opinion that the court did not apply the doctrine of reasonable doubt to this proposition of law, but on a more thorough examination of the record we find that he instructed the jury, in this connection, *if they* had a reasonable doubt

about those propositions, they would acquit. This, to our minds, did not shift the burden to defendant, but gave him the benefit of the reasonable doubt on that affirmative defense as well as all other propositions of law submitted in the charge. And we think it was a sufficient presentation of killing upon an independent motive, for he tells the jury that, although appellant was present at the time Grace was killed, yet, if they had a reasonable doubt as to whether he knew of the intent to commit an unlawful act that might lead to her being killed, or, if present, he did not aid or encourage the person offending, he would be guilty of no offense. As said by Mr. Branch, in section 242 of his Criminal Law: "Each conspirator is responsible for everything done by his confederate which follows immediately in the execution of the common design, as one of its natural and probable consequences, even though it was not intended as a part of the original design." (Mitchell v. State, 36 Texas Crim. Rep., 278; Bowers v. State, 24 Texas Crim. App., 542; Henry v. State, 54 S. W. Rep., 592.) How peculiarly applicable to the facts in this case is the rule laid down in 2 Bush, Crim. Law, sec. 692: "If several conspire to invade a man's household and go to it armed with deadly weapons, to attack and beat him, whereupon one gets into a difficulty with him and kills him, the rest are guilty also of murder, though they did not mean it."

There is, nor can there be, a question in this record that the parties conspired to go to the home of Joe Kellum and whip and beat him with a mule whip. The whip was found on the gallery. They break into his house, carrying guns with them, and in the difficulty following Grace Kellum is killed.

The next contention is that the court erred in instructing the jury, that, if Grace Kellum was killed by mistake or accident, when it was the intention to kill Joe Kellum, etc., the jury would find him guilty, it being insisted that there is no evidence to raise the issue that the shot was fired to kill Joe Kellum and by mistake killed Grace Kellum. If there was no evidence to raise such an issue, we would agree that such a charge should not have been given, but from a careful perusal of the record, we arrive at the same conclusion as did the trial judge. The record as a whole discloses they went to this house to whip Joe Kellum; that they broke into the house to get him for that purpose. Grace said nothing to anger them; Joe was hid behind the bed. It is true, Joe says that Hughes fired first; but Tom Hughes says that Joe Kellum fired first, and in this he is supported by the negroes who heard the shots. Hughes shot with a rifle. Joe Kellum used a shotgun. On cross-examination of the State's witnesses, appellant was diligent in proving by them that the shotgun was first fired, and then the rifle. Sheriff Howard testified he went to the scene of the homicide, and examined the premises; that the blood where Dock Hughes fell was between the door and fireplace; that he noticed some bullet holes in the wall—in the corner near the bedstead, where lay Grace Kellum's body; that the body of Grace Kellum was on a line from the bloody spot on the floor where Hughes fell and the holes in the wall near the

corner of the bedstead; that these bullet holes were about twenty-eight inches from the floor. If Joe Kellum fired first, as the testimony of Tom Hughes and the negroes who heard the shots indicates, the evidence raises the issue that Dock Hughes shot at the person who fired the shotgun and all the testimony shows that it was Joe Kellum who fired the shotgun, from his position behind the bed. And, if Dock Hughes shot at Joe Kellum and killed Grace Kellum, in the darkness firing at the flash of the gun, our statute provides (art. 48) if one intending to commit a felony and through mistake or accident, does another act which, if voluntarily done, would be a felony, he shall receive the punishment fixed by law to the offense actually committed. The question of when one person shoots at another, and kills a third person, has been frequently before the court, and it has always been held by this court that the accidental killing of a third party, in an attempt to slay another, is murder upon implied malice. (Breedlove v. State, 26 Texas Crim. App., 445; Musick v. State, 21 Texas Crim. App., 69; McConnell v. State, 13 Texas Crim. App., 390; McCoy v. State, 25 Texas, 33; Angell v. State, 36 Texas, 542; Thomas v. State, 53 Texas Crim. Rep., 272.) The evidence, in our opinion, clearly raises the issue that Grace Kellum was killed accidentally by a shot fired with the intention to kill Joe Kellum, under circumstances in which it would have been murder had Joe Kellum been killed.

The question of "ratification" discussed by Judge Davidson in the opinion on the motion for rehearing is not in the case, was not submitted by the court in his charge, and there is no evidence raising such an issue. The evidence would all tend to show that these four men conspired to go to the negro quarters and whip negroes; that it might become necessary to kill some of them in so doing was their opinion is manifested by their arming themselves with deadly weapons; that in furtherance and in pursuance of the common design a woman was killed, and it grew directly out of the conspiracy entered into by all four of the parties.

The other questions are fully discussed and authorities cited in the companion case of Harvey Davis v. State, in which the motion for rehearing is this day overruled.

Motion for rehearing granted, and the judgment of the trial court is affirmed.

*Affirmed.*

January 19, 1916.

DAVIDSON, Judge (dissenting).—On a former day of this term the judgment herein was reversed and remanded. The State filed a motion for rehearing upon two propositions, first, that the court was in error in holding that the charge to the jury with reference to the attitude of Dock Hughes acting upon an independent impulse was not sufficient. A re-examination of the charge clearly shows the charge totally insufficient. The second proposition relied upon is that the court was in error in holding that before appellant could be convicted

for killing Grace Kellum it ought to be shown that she came within the terms of the agreement made between the parties. Quoting State's rehearing motion, it says: "The State contends that if appellant subsequently ratified the intent of Dock Hughes he would be guilty," citing Branch's Criminal Law, section 242. The writer has never agreed, and does not believe it is correct to hold or say even that if Joe Kellum was killed when the original agreement was simply to whip him, and had he been killed by Dock Hughes, the other parties not participating in the killing, and such killing not in contemplation of their original design, that appellant would be guilty. If, however, it occurred under an original agreement or within contemplations of such agreement, such party might be held. A party to crime is governed by his own intent and connection with the act committed. The principle was recognized, however, in the original opinion by the writer that if in whipping Joe Kellum it was necessary to kill him to consummate the original design of whipping him in case he did not submit to it, that perhaps might, if the jury so found, make appellant responsible. That was stated in order to conform to what the writer believes the majority opinion held in the Serrata case. But the doctrine of ratification of crime has no place in criminal law so far as the writer is advised. That question came directly and pointedly in the case of Walker v. State, 29 Texas Crim. App., 621. Judge White, then Presiding Judge of the court, delivered that opinion, and his language is here quoted:

"In fact the evidence shows that the act was committed before he had an opportunity to aid by acts or encourage by words. Suppose that hearing the pistol and turning immediately he sees his drunken friend confronted by someone with whom he is engaged in a sudden difficulty, which has caused a shooting by the one party or the other, and under the impulse of the moment he strikes and knocks down the man who is confronting his friend. Does that make him a principal offender with Shearra, his friend, who has already fired the fatal shot which ultimately causes death to his adversary? It is contended by private counsel appearing for the State that it does, because a blow under these circumstances is a ratification and indorsement of whatsoever had been done by Shearra previously in the contest, and Shearra having done that which proves to be murder, that he indorsed and ratified the act and thereby became a principal to the murder which Shearra had already committed. We do not know of any such rule of criminal law. The doctrine of indorsement or ratification of an act already committed by another, so as to make the indorser and ratifier equally guilty with the main actor or party indorsed, is a principle and rule of conduct which we have not found laid down by any of the standard elementary authors of criminal law, and we know of no such rule having been announced in any of the decisions of the courts of last resort in this country, nor have we been cited to any authority bearing out that proposition by the learned and distinguished counsel for the State."

This is as clear a statement of the proposition as can well be made, and by one of the greatest jurists not only Texas but America has

produced. The doctrine of ratification of crime is an unheard of prin- ciple in criminal law. The nearest approach to it under the Penal Code of Texas is the reception of stolen property after it has been stolen, or an accessory after the act. But those statutes, recognizing the principle that there can be no ratification of crime, relates back so as to make a party who is not a principal in the original transaction guilty of a different offense by participation in subsequent acts. The statutes of Texas, by their language, necessary construction and inter- pretation, carry out the will and purpose of the Legislature, that there can not be a ratification of a consummated crime viewed from the standpoint of guilt as a principal or original participator in the crime. So far as we know, no court and no State has gone that far or so held. Mr. Branch, in the section cited by the motion for rehearing for the State, cites the authorities very fully, and draws tersely and accurately the propositions of law bearing upon this question. First he says, "If issue is raised, it is error to refuse to charge that if another killed deceased upon an independent impulse, and not in pursuance of an agreement with defendant, the jury should acquit," citing Smith v. State, 52 Texas Crim. Rep., 27; Faulkner v. State, 43 Texas Crim. Rep., 311; Cortez v. State, 43 Texas Crim. Rep., 375. Again, he states the rule: "If there is evidence that no more was contemplated than an ordinary battery on deceased, and that another, on an independent impulse, killed deceased, the court should charge affirmatively on such theory and inform the jury that if such was the purpose of defendant, and that another, besides the intent and purpose of defendant, killed deceased intentionally, that defendant would be guilty of no greater offense than assault and battery," citing Mitchell v. State, 36 Texas Crim. Rep., 278; Blain v. State, 30 Texas Crim. App., 702; Harris v. State, 15 Texas Crim. App., 629. Again, he states the rule: "If no more was contemplated than a mere misdemeanor, and one of the par- ties, besides the intention of the other, killed deceased, those not par- ties to the design to kill are not guilty of murder," citing Mitchell v. State, 36 Texas Crim. Rep., 278; Blain v. State, 30 Texas Crim. App., 702; Faulkner v. State, 43 Texas Crim. Rep., 311; Chapman v. State, 43 Texas Crim. Rep., 328; Renner v. State, 43 Texas Crim. Rep., 347. He further lays down the proposition that it is error to fail to submit the defensive theory that defendant would not be responsible for the act of his co-defendant, if the latter exceeded the original design, and killed deceased on his own account. Goodwin v. State, 58 Texas Crim. Rep., 496, 126 S. W. Rep., 582; Cecil v. State, 44 Texas Crim. Rep., 450; Faulkner v. State, 43 Texas Crim. Rep., 311; Chapman v. State, 43 Texas Crim. Rep., 328; Renner v. State, 43 Texas Crim. Rep., 347; Mercersmith v. State, 8 Texas Crim. App., 211; Stevenson v. State, 17 Texas Crim. App., 618. Citing Turner v. State, 20 Texas Crim. App., 56, he thus states the rule: "Evidence is insufficient to show defendant guilty of murder if it only shows that defendant, with others, went to deceased's for the purpose of whipping him, should he acknowledge that he had spoken with disrespect of another, and there is no evidence that

defendant intended anything further." Cases are also cited to support the proposition that defendant is to be judged by his own intent and not by the intent of others in a difficulty, unless he adopts and ratifies the intent of such other by aiding him by acts or encouraging him by words or gestures. Bibby v. State, 65 S. W. Rep., 193; Beckham v. State, 69 S. W. Rep., 534; Leslie v. State, 42 Texas Crim. Rep., 65. These propositions and authorities might be extended indefinitely. The doctrine of ratification might be held when the party is aiding the parties as principal.

Applying it directly to this case, if these parties, appellant being one, went to the house of Joe Kellum for the purpose of whipping him, appellant not being in the room where the homicide occurred, and not knowing anything about the matter with reference to the killing of the woman in the room, he might be responsible if the killing of Joe Kellum was in scope of agreement, if Joe had been killed, but certainly he ought not to be held responsible for the killing of the woman, and the jury should have been promptly and affirmatively and clearly so informed as to the law. The evidence does not suggest that the woman was included in any design of the parties. Appellant was not in the room where the killing occurred. Two of the parties went in there for the purpose of getting Joe Kellum out to give him a whipping; that was their only design, so far as appellant knew or had heard. There is not the remotest indication by any witness they intended to kill or injure the woman. In fact, it may be said that the woman was not in contemplation, and they did not even know that she was at the house. But there is no evidence in the entire record which shows that there was any intent to whip the woman or have anything to do with her. When they went in the room Joe Kellum secreted himself, and failing to find him, Dock Hughes shot and killed the woman. Appellant was not in there, knew nothing of it, and had nothing to do with it. He was on the outside, is the only contention of the State, and they introduced circumstances to prove that conclusion, but no fact, as the writer understands this record, is shown or offered in evidence that the death of the woman or her whipping or anything in that connection was in contemplation by any of the parties, and it seems to have been an entirely independent thought by Dock Hughes after he entered the room. The jury should have been told under those circumstances plainly and unequivocally the law applicable to this phase of the law. This was not done. All sorts of objections were urged to the charge and failure to give requested instructions. The question was thoroughly fought, and it was contended by the defense that appellant could not be guilty of killing the woman unless he could be brought within the contemplation of the design to do the act performed, and it was his intent so to do. How he could be held to ratify that killing subsequent to its occurrence, when he knew nothing of the design or act until its consummation I do not comprehend. Much is said about accident and mistake in the killing of the woman. I fail to find any fact that tends to so suggest.

Here is what Tom Hughes, the State's witness, swears, after entering the room with the deceased, Dock Hughes: "I struck the match and me and Dock went in and walked across the house. When we walked across the house, I struck the second match, and I asked the negro woman where the matches were. The negro woman was sitting on the side of the bed. She was sitting on the outside of the bed, next to the room. There was nobody else in the room,—that is, I didn't see anybody else. The match burned out, and I asked where the matches were, and she said she didn't have any matches, and I asked where the lamp was, and she said she didn't have any lamp, and about that time I struck the third match, and I saw an old lamp on the mantle. I tried to light it and there wasn't any oil in it, and the match went out and the negro shot Dock and Dock had the gun on the negro woman. When I had the match, when the negro shot him, he shot the negro wench." This is the State's witness, who saw the occurrence, and was first cousin to deceased, Dock Hughes. The question of mistake or accidental killing of the woman while shooting at Joe Kellum is not a question in the case. Tom Hughes' evidence eliminates this and leaves an intentional killing of the woman by Dock Hughes on his own sudden impulse and independent intent and entirely unknown to defendant and Davis. Dock Hughes did not shoot at Joe Kellum under these facts.

For reasons herein stated I dissented in Davis v. State, No. 3765.